FILED

2026 Apr-10  PM 04:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| **RYAN PASLEY** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **7:24-cv-1050-EGL** |
| | ) |
| **MERCEDES-BENZ U.S.** | ) |
| **INTERNATIONAL, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Ryan Pasley sued his employer, Defendant Mercedes-Benz U.S. International, Inc. (MBUSI), asserting claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, as well as claims of disability discrimination and retaliation under the Americans with Disabilities Act. *See* Doc. 23. Defendant MBUSI moves for summary judgment on all of Pasley's claims. Doc. 25. Having heard oral argument on the motion and considered the parties' briefs and evidentiary submissions, the Court finds that MBUSI's motion (Doc. 25) is due to be **GRANTED** for the reasons below.

Also pending before the Court is MBUSI's Motion to Strike (Doc. 36). That motion (Doc. 36) is **MOOT** because the resolution is not material for the Court's determination as to the pending summary judgment motion.

## BACKGROUND

Most of the relevant facts are undisputed and are set out below. Any disputes are noted by the Court and do not create material issues of fact.

Pasley is a black male who began working at MBUSI on October 18, 2004. Doc. 28 at ¶1. He worked as a body shop Team Member, was promoted to Team Leader in 2006, then stepped down from Team Leader to take a Team Member position in the Coordinate Measurement Machine shop (CMM) in 2013. *Id.*

The employee, leadership, and shift structure of the CMM shop is relevant to Pasley's claims. In 2023, there were two different groups of employees: Specialists and Operators. Operators, employees who use large machines to measure vehicles, worked in two shifts—A Shift and B Shift. *Id.* at ¶¶6-7. The two shifts rotated every two weeks between evening and day shift. *Id.* Specialists, employees who performed specialized programming, worked only day shift. *Id.* At the beginning of the relevant period, Pasley and Mike McRee[1] were Team Member Operators working A Shift, *id.* at ¶7, and Stephen Stone was a Team Member Specialist, *id.* at ¶6. Frank Coffin worked as Group Leader until April 2023, and Andreas Roller was the Manager until

---

[1] The parties are inconsistent with spelling. Sometimes they spell this individual's name "McRee," Doc. 28 at ¶10; Doc. 32 at 5, ¶13, but there are instances they spell it "McCree," Doc. 28 at ¶¶15, 25. The records indicate that his name is "Michael McRee." Doc. 26-8.

February 2024. *Id.* at ¶¶3-4. Stone and McRee are white, and Coffin's race is disputed between the parties, but ultimately is irrelevant.[2]

The issues raised by Pasley in this action began in relation to an internal promotion process.

### A. Promotional Process and Shift Transfer

In 2022, a Team Leader position opened in the CMM shop. Doc. 28 at ¶8. Pasley, Mike McRee, Phil McDuff, and Reggie Oswalt applied, with Oswalt ultimately being selected. *Id*. at ¶¶8, 10. In April 2023, Coffin retired as Group Leader, and Nicholas Lackner was selected as Group Leader for the CMM shop. *Id.* at ¶¶14, 24. In 2023, another Team Leader position for A Shift opened in the CMM shop; Stone, McRee, and Pasley applied. *Id.* at ¶¶11, 15.

MBUSI explained the process to fill a Team Leader position. The relevant shop will request a position, management will approve the request, and HR will then post a QR code through which a Team Member can nominate other members for the position or self-nominate. *Id.* at ¶9. If a candidate meets the minimum qualifications, HR will send out a request for peer input on each candidate. *Id.* Team Members provide peer input, HR sends the results to management, and management and HR make the final determination. *Id.* Pasley concedes that MBUSI uses this process but

---

[2] Coffin testified that everyone in Alabama "thinks" he is black, Doc. 28 at ¶4; Doc. 32 at 4, ¶4, but that he identifies as "Hispanic" and "mixed," Doc. 26-6 at 11, and Pasley's evidence suggests Coffin is Panamanian, Doc. 32 at 4, ¶4.

argues that it has not always been followed. Doc. 32 at 4-5, ¶9. He contends that MBUSI has, in the past, promoted by seniority instead. *Id.*

Regardless of how MBUSI promoted in the past, it is undisputed that the QR code/peer input process was utilized for the relevant 2023 Team Leader promotion. MBUSI posted the position, and as noted, Stone, McRee, and Pasley applied. Doc. 28 at ¶15. MBUSI determined that only McRee met the minimum criteria, so it solicited peer input for McRee, but not Stone or Pasley. *Id.* at ¶17. When Pasley learned that MBUSI was not requesting peer input for him, he was confused and followed up, inquiring as to why he was not listed as eligible. *Id.* at ¶18.

MBUSI informed Pasley that his most recent evaluation had rated him as "develop at the same level" rather than "ready for advancement," *id.* at ¶19, and a "ready for advancement" evaluation was a necessary qualification for promotion, *id.* at ¶16. Pasley then contacted HR because he believed that he had been marked "ready" in his last evaluation. *Id.* at ¶¶19-20. Stone also raised the same concern at this time. *Id.* at ¶21.

When Pasley went to HR, an HR specialist halted the promotion process to allow time to investigate the issue. *Id.* at ¶20; Doc. 26-13 at 14. The investigation revealed that Coffin, the Group Leader, had completed evaluations but failed to review them with each Team Member. Doc. 28 at ¶22; Doc. 26-13 at 14. Pasley had in fact been marked as "develop at the same level" in his most recent evaluation, but

had been marked as "ready" in the evaluation preceding that one. Doc. 28 at ¶¶19, 22.

Since multiple Team Members had not received notice of their most recent evaluations, MBUSI decided to restart the promotion process and have Lackner, the current Group Leader, evaluate all applicants. *Id.* at ¶¶22, 25. As part of this process, Lackner moved Pasley to B Shift so that he could evaluate McRee and Pasley, the two Operator applicants (Stone was a Specialist), on separate shifts. *Id.* at ¶25. MBUSI believed that Pasley was "agreeable to the move." *Id.* While Pasley disputes this fact by claiming that he "questioned why … Lackner was moving him," Doc. 32 at 6, ¶25, the evidence Pasley cites does not show that he ever communicated his "question[ing]" to MBUSI, *see id.* (citing Doc. 26-1 at 18, 62:1-16). Pasley's race discrimination claims are based partially on the transfer and on interactions that occurred after the transfer.

While working B Shift, Pasley was on a break at his workstation watching a video on his phone, and Lackner told him to turn the sound off or use headphones. Doc. 28 at ¶¶26, 27; Doc. 32 at 6, ¶27. Pasley was apparently the only Team Member singled out, and he alleges other workers typically listen to audio out loud. Doc. 32

5

at 6, ¶27. In addition to the cell phone incident, Pasley alleges generally that Lackner

mistreated him and did not verbally engage with him.[3]

On June 15, 2023, Pasley told Lackner he wanted to return to A Shift, and

Lackner denied the request. Doc. 28 at ¶29. That same day, Pasley went to speak

with HR. Doc. 32 at 7, ¶29; Doc. 26-13 at 82. After initially denying the transfer

request, Lackner informed Pasley that he could return to A Shift if he withdrew from

the promotional process, Doc. 28 at ¶29, because the promotion evaluation was the

reason for the shift change, Doc. 26-13 at 15. On June 22, 2023, Pasley sent the

following email to Lackner, Roller (manager), and others:

> I Ryan Darrell Pasley, on this 22nd day of June would like to remove
> my name from the Team Leader promotion list for the CMM Lab. The
> reason for this action is because my Group Leader Nicholas Lackner
> informed that if I write a statement taking my name off the list I could
> then return back to my regular shift. He had previously denied without
> cause, but I was told when I was moved from A-Shift it was for
> evaluation purposes for Team Leader. These type of mind game
> continues to show the created hostile work environment and retaliation
> against me for wanting to be treated fairly. Based on that and the advice
> of my wife and VA Psychiatrist [] who treats me for PTSD. He feels

---

[3] Due to the transfer, Pasley was working nights on dates he originally planned to work days, and he missed his daughter's graduation. Doc. 28 at ¶28. The only relevant allegation from this fact is that Lackner would not talk to him when he approached him, but it undisputed that he did not attempt to formally request time off for the graduation, *id.*; Doc. 32 at 7, ¶28.

that this undo [sic] stress could greatly aggravate my condition. So for my mental health I will exit this process.

Doc. 26-2 at 7. Pasley returned to A Shift. Doc. 28 at ¶34. With only two remaining applicants for promotion, Lackner appointed McRee to Team Leader for A Shift and decided to appoint Stone as a Team Leader over the Specialists. *Id.* at ¶¶36-37.

### B. Short-Term Leave

Pasley decided to take time off beginning in August 2023, and he applied for short-term disability and family medical leave. *Id.* at ¶¶40-41. MBUSI granted Pasley's request for family medical leave but denied his short-term disability leave because his application did not contain sufficient medical documentation. *Id.* at ¶¶43-44. Pasley disputes this conclusion, arguing that his medical documentation met the requirements for short-term disability. Doc. 32 at 10-11, ¶¶45-46. He also claims that he made numerous efforts to confirm the approval and was informed by an HR employee that he was good to go. *Id.* at 9-10, ¶42. The dispute as to whether his short-term disability was correctly denied is not relevant for purposes of this motion.

### C. Continued Issues at Work

Apparently Pasley's work problems did not end after he returned to A Shift. In December 2023, after Pasley's leave, he again received an evaluation of "develop at the same level" based on Lackner's view that Pasley lacked the necessary communication skills for promotion. Doc. 28 at ¶¶48-49. And then in March 2024,

Lackner asked Pasley to remove union paperwork that was sitting on his desk, *id.* at ¶53, allegedly in an aggressive manner, Doc. 32 at 12, ¶53. Pasley also alleges that he was denied the use of flex-time, but that he observed white employees being allowed to use it. Doc. 23 at ¶¶41-43.[4]

### D. EEOC Charges

Pasley filed an EEOC Charge of Discrimination on October 27, 2023, alleging that he was retaliated and discriminated against because of his race. Doc. 26-2 at 44-45. In support of his claim, he details the promotional process, the move to B Shift, the cell phone incident, and his subsequent return to A Shift and withdrawal from consideration for promotion. *Id.* The charge does not mention a disability, Pasley's PTSD, or any allegations relating to a request for an accommodation. *Id.*

On February 28, 2024, Pasley filed an Amended Charge, this time with the assistance of counsel. *Id.* at 46-47. The amended charge added factual details and for the first time alleged disability discrimination. *Id.* The amended charge alleges facts regarding Pasley's PTSD, requests for accommodation, and MBUSI's failure to accommodate. *Id.*

---

[4] In his response to MBUSI's motion for summary judgment, Pasley seems to have abandoned this claim. He does not support it with citations to the record, and indeed asserts that "Roller paused the use of flex-time in CMM." Doc. 32 at 14, ¶7. This concession seems to contradict his claim that he was not allowed to use flex time because of his race.

**E. The Lawsuit**

After the EEOC closed its investigation, Pasley brought this action against MBUSI, asserting multiple causes of action. *See* Doc. 1. Pasley's amended complaint asserts six counts: race discrimination under Title VII and 42 U.S.C. § 1981, disability discrimination and failure to accommodate under the ADA, and retaliation under Title VII, § 1981, and the ADA. *See generally* Doc. 23. MBUSI moves for summary judgement on all claims. *See* Doc. 25.

## STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In reviewing the evidence submitted, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). In considering a motion for summary judgment, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**ANALYSIS**

## I.  Counts I and II: Race Discrimination

Pasley asserts Title VII and § 1981 racial discrimination claims against MBUSI, alleging that MBUSI discriminated against him by marking him not ready for promotion, transferring him to another shift, treating him different than white employees regarding "flex time" and cell phone use, and failing to promote him to Team Lead. Doc. 23 at ¶¶130-44. Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Similarly, 42 U.S.C. § 1981 "affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). Pasley's claims under Title VII and § 1981 "have the same requirements of proof and use the same analytical framework," *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), so the Court will evaluate Counts I and II together, except for Pasley's failure to promote theory.

### A. Failure to Promote Theory

In only his § 1981 claim, Pasley alleges MBUSI "discriminated against [him] by failing to promote him to team lead and maintaining him as ineligible for promotion." Doc. 23 at ¶140. To prove a § 1981 claim, Pasley must establish that

11

"race was a but-for cause of [his] injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020). He cannot do so. It is undisputed that Pasley voluntarily withdrew his name from consideration. And at the hearing on this motion, Pasley conceded that there is no evidence that MBUSI forced Pasley to withdraw from the promotion based on his race. Any race discrimination claim based on a failure to promote theory therefore fails as a matter of law.

**B. Incidents Other Than the Failure to Promote**

Omitting the promotion decision, Pasley's race discrimination claims are based on "marking him 'not ready' for the next level on evaluations," "transferring him to another shift," and allegedly "treating him different from white employees regarding flex time, cell phone use, and personal interactions." Doc. 23 at ¶¶131-32, 138-39. He supports his claim with circumstantial evidence, attempting to show that MBUSI discriminated against him based on his race. *See Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) ("A plaintiff may use either direct evidence or circumstantial evidence to show race discrimination.").

Where a plaintiff seeks to prove his race discrimination claims based on circumstantial evidence alone, the *McDonnell Douglas* framework provides courts with a helpful tool. *Ismael v. Roundtree*, 161 F.4th 752, 765 (11th Cir. 2025). But where a plaintiff cannot establish a prima facie case, he may still avoid summary judgment if he presents a "convincing mosaic" of circumstantial evidence,

demonstrating a material issue of triable fact on the issue of intentional discrimination. *Id.*

As an initial matter, some the actions MBUSI allegedly undertook do not amount to an adverse employment action—which is not only an element of a prima facie case, but an essential element of the discrimination claim itself, without which there is no Title VII or § 1981 liability. *Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012); *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023). Title VII protects against adverse employment actions based on race, which in this context, "consist of things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020). Pasley "must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024). His complaints about the transfer to B Shift, the cell phone incident, and other "personal interactions" do not meet that standard.

### 1. The Transfer

Pasley gives the Court no reason why the transfer to B Shift left him "worse off," *id.*, as all of Pasley's allegations relate to Lackner's mistreatment of Pasley—but Lackner was Pasley's group leader on A Shift as well. When the shifts are identical and the only harm identified would have been present on A Shift as well,

13

the Court does not find that Pasley demonstrated that the transfer (which was only in effect for a few weeks) affected the terms and conditions of his employment. *Id.* at 347 ("[A] transferee must show some harm respecting an identifiable term or condition of employment."). "The critical issue, Title VII's text indicates, is whether" Pasley—because he is black—was "exposed to disadvantageous terms or conditions of employment to which members of" another race were "not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Pasley identifies no "disadvantageous terms or conditions" of B Shift that weren't present on A Shift.

Moreover, even if the transfer were an adverse employment action, Pasley has "fail[ed] to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination," because there is "not enough evidence to infer discrimination" is why Lackner moved Pasley to B Shift. *Tynes*, 88 F.4th at 947. Pasley makes two assertions about the transfer in his brief opposing summary judgment:

> • MBUSI ignored the seniority rules when moving Pasley to another shift and swapped him with the only Black team member on that shift.
>
> • Lackner, (White) did not evaluate Pasley after alleging that's why he moved him to B Shift. He was not in Pasley's presence to observe him for at least one month. He promoted McRee (White) without evaluating him and created a new position for Stone (White).

Doc. 32 at 30. But neither assertion is supported by a citation to the record, nor apparently by any citations to the record earlier in Pasley's brief. As to the first bullet

14

point, there is no evidence of "seniority rules" regarding which Team Member gets transferred to another shift when a Group Leader wants to evaluate two Team Members for a Team Leader position. As to the second, Pasley is apparently referring to his earlier contention that "Lackner would not have interacted with Pasley or be[en] able to observe him when on evening shift for 4 weeks," *id.* at 14, based on the fact that Lackner's time at work overlapped with the day shift, and that A Shift had just finished up two weeks of night shift when Pasley was transferred to B Shift, meaning that for four weeks, Lackner could not evaluate him. But the same would have been true for McRee had he been transferred to B Shift. And it is unclear what evidence Pasley relies on to assert that Lackner promoted McRee without evaluating him; the Court will not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992). Finally, Pasley has not shown that creating a Team Lead for Specialists and appointing Stone, who was a Specialist, for the position indicates that Lackner moved Pasley to B Shift because he was black.

### 2. *The Cell Phone Incident and Other "Personal Interactions"*

On the record before the Court, there is no evidence showing that the cell phone incident or other personal interactions were any more than a "[t]rivial slights"—the perhaps unpleasant interactions were not a "tangible employment

15

action" because Pasley has not shown any way it affected his "continued employment or pay." *Monaghan*, 955 F.3d at 859-60.

### 3. Flex-time Use

Pasley alleges in his amended complaint that "Defendant … discriminated against Pasley by treating him different from white employees regarding flex time," Doc. 23 at ¶139, but he has not adequately supported that allegation in his summary judgment briefing. Indeed, he does not dispute that while "MBUSI was more liberal in the CMM Shop and allowed the use of flex time," "[w]hen David Hunter became GL over the CMM Shop in December 2024, he discontinued the use of flex time as to all CMM TMs." Doc. 28 at ¶¶54-55; Doc. 32 at 12. He mentions "flex time" only once in his opposition to MBUSI's summary-judgment motion, and then only to note that "Roller paused the use of flex-time in CMM." Doc. 32 at 14. Thus, Pasley's claim as to the use of flex time fails as a matter of law, and in considering Pasley's claims, the only actionable "adverse employment action" is the evaluation by Coffin.

### 4. The "Not Ready" Evaluation

Pasley's "not ready" evaluation is an adverse employment action because it affected his ability to be promoted. *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005) ("[A]n evaluation that directly disentitles an employee to a raise of any significance is an adverse employment action under Title VII."). But Pasley

16

must "put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination." *Ismael*, 161 F.4th at 763.

One way a plaintiff can survive summary judgment on an intentional race discrimination claim is by establishing his case under the three-step *McDonnell Douglas* burden shifting framework. *Lewis v. City of Union City (Lewis I)*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc). In step one, the plaintiff must establish a prima facie case of discrimination by showing he (A) belongs to a protected class; (B) was subjected to an adverse employment action, (C) was qualified to perform the job in question, and (D) his "employer treated 'similarly situated' employees outside [his] class more favorably." *Tynes*, 88 F.4th at 944. If the plaintiff makes this prima facie showing, he is entitled "to a rebuttable presumption of intentional discrimination," and then at the second step, the defendant must rebut the presumption "by offering evidence of a valid, non-discriminatory justification for the adverse employment action." *Id.* If the defendant succeeds, then at the third step, "the presumption of discrimination falls away and the plaintiff tries to show not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination." *Id.* The Court need not reach steps two and three of the *McDonnell Douglas* framework because Pasley has not established a prima facie case. *See Ismael*, 161 F.4th at 765.

17

Since Pasley's failure to establish any of the four elements of step one dooms his prima facie case, *Johnson v. Miami-Dade Cnty.*, 169 F.4th 1301, 1307-08 (11th Cir. 2026), the Court proceeds to the fourth element to determine if Pasley "presents evidence of a comparator—someone who is similarly situated in all material respects." *Tynes*, 88 F.4th at 944 (internal quotation marks omitted) (quoting *Jenkins*, 26 F.4th at 1249). A plaintiff can establish that a comparator is "sufficiently similar" by presenting evidence that the comparator and plaintiff: engaged in the same conduct, were subject to the same employment guidelines, were under the jurisdiction of the same supervisor, shared the same employment or disciplinary history, or other evidence tending to show similarity in "all material respects." *Lewis I*, 918 F.3d at 1227-28.

Pasley has not proffered a comparator for his evaluation allegation, *see* Doc. 23 at ¶¶131, 138, because he fails to allege an employee, similar in all material respects, who was marked "ready" when Pasley was marked "not ready." While the record contains evidence of both Stone's and McRee's evaluations, neither can serve as a comparator. McRee, a white employee, was marked "ready" when Pasley was marked "not ready" in the 2023 evaluations, Doc. 28 at ¶17, but the record does not contain details of McRee's employment history, disciplinary history, or any other evidence that would allow the Court to determine if he is similarly situated enough to be a valid comparator for Pasley. While we know that McRee was an Operator on

A Shift, like Pasley, *id.* at ¶7, there is not enough evidence for the Court to find that he was "similarly situated in all material respects," which is a "high bar to meet." *Tynes*, 88 F.4th at 947; *see Coleman v. Morris-Shea Bridge Co.*, No. 21-13764, 2026 WL 551909, at *5 (11th Cir. Feb. 27, 2026) ("We have frequently found comparators invalid despite sharing a formal title."). Pasley clearly has not met this "high bar" when he presents no actual evidence comparing himself to McRee.[5] Stone, another white employee, cannot serve as Pasley's comparator because it is undisputed that he was also marked "not ready," and therefore not treated more favorably than Pasley. *See* Doc. 28 at ¶¶17, 21.

In his response, Pasley argues that "viewing the evidence in the light most favorable to Pasley, he has pointed to differential treatment of multiple employees …." Doc. 32 at 34 n.6. But he clearly has not done so, and where the burden was on Pasley to provide valid comparator evidence, *see Lewis I*, 918 F.3d at 1217, a conclusory assertion in his response does not suffice. The Court is not required to mine the record for Pasley to find a valid comparator for his claims. Thus, he has not established a prima facie case.

Pasley's failure to establish a comparator and resulting failure to establish a prima facie case does not end the Court's analysis. *Lewis v. City of Union City*

---

[5] Pasley avers that McRee was provided with more training, tools, and growth opportunities. Doc. 32 at 9, ¶39; *see* Doc. 31-2 at ¶7; Doc. 31-1 at ¶11. So Pasley's own contentions at least suggest that McRee had different work and leadership experience and was not similarly situated to Pasley.

19

*(Lewis II)*, 934 F.3d 1169, 1185 (11th Cir. 2019).  Pasley can still survive summary judgment if he produces a "wide range of circumstantial evidence," creating a "convincing mosaic," that will allow a jury to infer intentional discrimination by MBUSI. *Ismael*, 161 F.4th at 760. Evidence establishing this mosaic may include, "among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins*, 26 F.4th at 1250 (internal quotation marks omitted) (quoting *Lewis II*, 934 F.3d at 1185).[6]

Pasley provides three pages of bullet-pointed "circumstantial evidence" to support his undifferentiated "race claims," Doc. 32 at 28, and argues, absent citations to the record, supporting authority, or significant analysis, that he has created a convincing mosaic. *Id.* at 28-32. But even after trying to connect Pasley's assertions with the record cites he offers earlier in his brief, much of Pasley's "proffered evidence" is simply unsupported or unhelpful. Pasley bears the burden to produce evidence that would permit a reasonable juror to infer that *race* motivated the specific actions against him. He has not done so. For example, he alleges that "[t]he computer program used to run audits in CMM refers to machines as slave and

---

[6] In order to see if he creates a convincing mosaic, the Court will consider all the evidence, including the incidents that did not rise to the level of constituting adverse employment actions. Similarly, the Court will consider the evidence regarding other employees, even though they were not "strict comparators." *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1198 (11th Cir. 2024).

master," and that MBUSI did not change the program after black employees complained about the titles. *Id.* at 31. But Pasley doesn't explain how that fact makes it likely that any of the alleged actions of which Pasley complains were based on his race. Considering the totality of the evidence and the whole picture that Pasley paints, there is no evidence pointing to any "link[]" between the actions against him and his race. *See Turner v. Fla. Prepaid Coll. Bd.*, 522 F. App'x 829, 833 (11th Cir. 2013) ("Unless something links the actions to the employee's race, that a decisionmaker singles an employee out does not permit a jury to infer intentional discrimination based on race.").

As to Pasley's evaluation, the record shows that a white employee (Stone) was also marked not ready for promotion. And on the shift transfer, Pasley's only evidence purporting to show a connection to race is that he was switched with the only black employee on B Shift, but without more, this does not show that he was moved to B Shift based on discriminatory intent, much less that his "not ready" evaluation was based on his race. The cell phone incident similarly provides no support for Pasley's claim. By pointing out that *everyone else*—black, white, or otherwise—was allowed to use their cell phones with volume on, Pasley undercuts the notion that Pasley was singled out due to his race. If both white and black employees used their cell phones with volume on and only Pasley was singled out—

the singling out, while perhaps misguided, does not appear to be on account of his race.

While the convincing mosaic inquiry is technically outside the bounds of *McDonnell Douglas* framework, the questions asked in that framework are still relevant. *Tynes*, 88 F.4th at 946. And where, like here, a plaintiff fails to rebut the defendant's proffered non-discriminatory reasons for its actions, that failure tends to make the "mosaic" significantly less convincing.[7] Disagreement with MBUSI's rating decision is simply a "quarrel[] with the wisdom of that reason" and not a credible rebuttable. *See Chapmon v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.").

While Pasley is correct that he technically does not have to "rebut each reason head on," show pretext, or point to comparators, Doc. 32 at 31-32, the failure to do so is still relevant to the viability of his claims. Pasley says he "only needs to produce some circumstantial evidence," *id.* at 32, but that is not the standard. The circumstantial evidence must "directly create an inference of discrimination" for Pasley to survive summary judgment. *Ismael*, 161 F.4th at 763. He still has the

---

[7] A showing of pretext is not the "end-all be-all," but the plaintiff still has "the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Ismael*, 161 F.4th at 762.

ultimate burden to produce enough evidence to allow a reasonable jury to find intentional discrimination. *Tynes*, 88 F.4th at 946. And this he has not done.

Pasley's claims fail under the convincing mosaic standard for many of the same reasons he fails to make out a prima facie case. The two "standards" look to the same ultimate inquiry—whether there is enough evidence for a jury to find intentional discrimination. *Id.* at 947. And most of the time, "[a] failure in the prima facie case often also reflects a failure of the overall evidence" because "the *questions* the plaintiff must answer to make a prima facie case are relevant to the ultimate question of discrimination." *Id.* at 945-46. Pasley relies heavily on the convincing mosaic standard, but critically, this standard does not somehow transform his claims or the record. "The same evidence placed in a looser frame does not transform it into something new." *Melton v. I-10 Truck Ctr. Inc.*, 166 F.4th 905, 915 (11th Cir. 2026). Whether the Court looks to the *McDonell Douglas* framework, the convincing mosaic standard, or only Federal Rule of Civil Procedure 56, the result is the same— there is simply not enough evidence in the record for a jury to find for Pasley on the "ultimate question" of intentional discrimination. *Tynes*, 88 F.4th at 946.

## II. Counts IV and V: Title VII and § 1981 Retaliation

Pasley asserts claims for retaliation under Title VII and § 1981, alleging he was retaliated against after he engaged in protected activity by complaining of discrimination. Doc. 23 at ¶¶158-67, 168-78. To establish a prima facie case of

23

retaliation, Pasley must show (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal relationship between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). Pasley concedes that his only protected activity was filing his EEOC charge in October 2023.[8] This concession limits the potential retaliatory actions to the following: Lackner evaluating Pasley as "not ready," requiring a black witness to be present during a meeting, and attempting to report Pasley to HR for pro-union pamphlets.  Doc. 23 at ¶¶164-66, 174-76.

MBUSI argues that the evaluation, witness, and union pamphlet incidents cannot constitute adverse employment actions. Doc. 28 at 28. The Court will assume the December 2023 evaluation is a sufficient adverse employment action, *see Gillis*, 400 F.3d at 888, but the other allegations are not actionable. In the retaliation context, mistreatment is actionable if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," even if it does not "rise[] to the level of a tangible employment action." *Monaghan*, 955 F.3d at 861 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). But Pasley does not explain how having a witness sit in on a meeting would meet this standard. And there is no evidence in the record that Lackner "attempted to report

---

[8] Pasley conceded this at the hearing held on this motion on March 10, 2026.

Pasley to HR,"[9] so the only question remaining is whether Lackner asking Pasley to remove union paperwork from his desk constitutes an adverse employment action. On the current record, the Court finds that the request does not meet this standard. Pasley was not disciplined in any way, and the record does not show how this mistreatment would constitute an adverse employment.

As to causation, MBUSI correctly notes that there is no record evidence showing Lackner's knowledge of the EEOC complaint. Doc. 28 at 27. To succeed on his retaliation claim, Pasley "needs to show" that Lackner "actually knew about [his] protected expression," the EEOC charge. *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020). At the hearing on this motion, Pasley argued that everyone knew about the charge. This broad assertion is not supported by evidence, and Lackner's awareness cannot be established by "unsupported inference." *Id.* Pasley's "speculation about [his] boss's knowledge cannot make up for the missing evidence," *id.* at 1050, and he has failed to show a genuine issue of material fact on this claim.

Even if the Court assumed Pasley satisfied the prima facie case, MBUSI has also briefed Lackner's legitimate business reason for evaluating Pasley as "not

---

[9] In discussing this incident, Pasley says that after he did not respond to Lackner about the paperwork, Lackner "went to his desk and began fervently typing – likely a report to HR." Doc. 32 at 12, ¶53. This speculation is not evidence that Lackner attempted to report Pasley to HR for the union paperwork.

ready"—his lack of communication skills and the necessary leadership qualities. Doc. 28 at 19-20. And Pasley failed to show that these reasons were pretextual. *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002). To be sure, Pasley avers that he has sufficient communication skills and should have been marked ready for promotion. "But [Pasley's] disagreement with [Lackner's] assessment of his performance does not suffice to show pretext." *Cooper v. Airbus Americas, Inc.*, No. 25-10378, 2026 WL 852233, at *9 (11th Cir. Mar. 27, 2026) (citing *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022)); *see also Coleman*, 2026 WL 551909, at *6 ("The inquiry into pretext centers on the employer's beliefs ... not on reality as it exists outside the decision maker's head.").

### III.    Counts III and VI: Disability Discrimination and Retaliation

Under the ADA, Pasley alleges disability discrimination, failure to accommodate, and retaliation. In Count III, Pasley alleges that MBUSI discriminated against him because of his PTSD and failed to accommodate him, in violation of the ADA. Doc. 23 at ¶¶145-57. In Count VI, Pasley alleges that MBUSI retaliated against him because he engaged in ADA protected conduct. *Id.* at ¶¶179-87. MBUSI moves for summary judgment on both claims, arguing (1) Pasley's claims are barred because he failed to exhaust his administrative remedies, and (2) that Pasley's ADA claims fail as a matter of law. Doc. 28 at 30.

### A. Failure to Administratively Exhaust His Claims

Pasley filed an EEOC Charge of Discrimination on October 27, 2023, claiming that MBUSI had retaliated and discriminated against him because of his race. Doc. 26-2 at 44-45. In February 2024, Pasley filed a counseled Amended Charge, including details of his PTSD and alleged disability discrimination and failure to accommodate. *Id.* at 46-47. In moving for summary judgment, MBUSI argues that Pasley's ADA claims are barred because the Amended Charge does not "relate back" to his October 2023 charge. Doc. 28 at 30-33. Pasley, in turn, does not argue that his February 2024 amendments relate back; he contends that he fully exhausted his ADA claims when he brought his original 2023 charge. *See* Doc. 32 at 18-19.

Before filing a judicial complaint alleging discrimination or retaliation under the ADA, a plaintiff must exhaust his administrative remedies by filing a Charge of Discrimination with the EEOC. *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018); *Zillyette v. Cap. One Fin. Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999) ("It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII of the Civil Rights Act of 1964."). By statute, the "[c]harges shall be in writing under oath or affirmation," 42 U.S.C. § 2000e-5(b), and its filing "initiates 'an integrated, multi-step enforcement procedure' that enables the EEOC to detect and remedy various discriminatory

27

employment practices." *Pijnenburg v. W. Ga. Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001) (quoting *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 61-62 (1984)). After receiving the charge, the EEOC must provide "notice to the employer within a specified time period that a charge has been filed," and must investigate the charges. *Id.* This filing thus provides the EEOC "the 'first opportunity to investigate the alleged discriminatory practices [and] perform its role in obtaining voluntary compliance and promoting conciliation efforts.'" *Batson*, 897 F.3d at 1327 (quoting *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004)); *Wu v. Thomas*, 863 F.2d 1543, 1548 (11th Cir. 1989).

"In light of [this] purpose," a plaintiff's judicial complaint is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," and courts should allow only judicial claims which "amplify, clarify, or more clearly focus the allegations in the EEOC complaint." *Gregory*, 355 F.3d at 1279-80 (internal quotations omitted). It is "inappropriate" for a plaintiff to allege "new acts of discrimination." *Id.* The Court therefore must determine whether Pasley's ADA failure to accommodate, disability discrimination, and retaliation claims are "like or related to, or grew out of, the allegations contained in [his] EEOC charge." *Id.* at 1280.

Pasley's October 27, 2023, EEOC charge focuses solely on race. For the box "DISCRIMINATION BASED ON" he lists "Race, Retaliation." Doc. 26-2 at 44.

28

When it comes to the facts underlying the charge, he begins: "I am African American," and then recounts some of the allegations over the promotion and transfer process discussed above, including that "[t]he team lead position was given to Mr. McCree and another team lead position was created and given to Stephen Stone (Caucasian)." *Id.* at 44-45. It concludes: "I believe that I have been retaliated and discriminated against because of my race (African American) in violation of Title VII …." *Id.* at 45. The narrative statement does not even generally reference disability discrimination or Pasley's PTSD. *Id.* [10]

Faced with this charge, the EEOC could not have reasonably been expected to investigate whether MBUSI discriminated against Pasley based on his PTSD or failed to provide accommodations for his PTSD. The case is much like *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1224 (11th Cir. 2000), in which the plaintiff "brought a retaliation claim" in court that differed from the one he described in his charge. In the charge:

> Chanda checked the "retaliation" box as well as the "disability" box on his EEOC papers and in the "particulars" section thereof wrote "I also complained about discrimination." Chanda's affidavit, however, states that he was "retaliated against because [he] complained both verbally and in writing about discrimination due to [his] disability." While his EEOC affidavit appears to allege retaliation for complaining of discrimination based on his disability, Chanda brought the claim under

---

[10] Pasley filed a counseled amended EEOC charge on February 28, 2024, and included allegations of disability discrimination. Doc. 26-2 at 46-47. But because Pasley does not contend that this amendment relates back to his original charge, the Court considers only his original charge and whether this complaint grew out of the factual allegations in that charge.

> Title VII in his complaint, couching it as a[n] ethnic discrimination claim.

*Id.* at 1224-25. The Eleventh Circuit didn't buy it. While "Chanda's EEOC filing reflect[ed] an intention to pursue a retaliation claim, … "there [wa]s no reference to a national origin claim," and "[n]othing in his EEOC filing mention[ed] discrimination based on national origin, any complaint about such discrimination, or a claim under Title VII." *Id.* at 1225. The court thus concluded "that a reasonable investigation based on the EEOC charge did not and would not encompass retaliation based on complaints about national origin discrimination." *Id.*

The same is true for Pasley. Nothing in his EEOC filing mentioned discrimination based on PTSD, any complaint about such discrimination, or a claim under the ADA. That charge, focused solely on race, would not lead a reasonable investigator to delve into the sort of ADA claims that Pasley brings here.

Consider too the Eleventh Circuit's recent decision in *Mukhina v. Walmart, Inc.*, 162 F.4th 1128 (11th Cir. 2025). There the plaintiff argued she had sufficiently exhausted a claim of religious discrimination in her charge of national origin discrimination and retaliation because she stated that she was "denied time off on New Year's Eve, one of the most important holidays for [Mukhina] as a Russian person with many national traditions" and compared it to the holiday of Christmas Day in America. *Id.* at 1132 (internal quotation marks omitted). The EEOC was not required to connect the dots when Mukhina did not specifically explain that New

Year's Eve was a religious holiday. *Id.* The factual allegation regarding her denied time off did not serve to exhaust her religious discrimination claim, even though the two were related. *Id.* at 1132-33. Under *Mukhina*, Pasley did not exhaust his disability claims.

Pasley responds that his "finalized charge includes an e-mail" that addresses his PTSD. Doc. 32 at 21. But that's not accurate. His charge *mentions* an email that *mentions* PTSD, but that is not enough to exhaust his ADA claims for at least two reasons. First, the sworn allegations in the charge are what count. And while Pasley declared under penalty of perjury that he "wrote a letter to Mr. Lackner, HR, and the management chain informing them that I had been retaliated against and subjected to a hostile work environment," Doc. 26-2 at 45, he never swore to the statements in the email (especially those not referenced in the charge). They are not "allegations in the EEOC complaint." *Gregory*, 355 F.3d at 1279.

Second, the email makes only a vague reference to Pasley's PTSD, *see* Doc. 26-2 at 7, while the charge details the promotional process, mistreatment by Lackner, and the shift transfer—all actions supposedly taken against Pasley because of his race, *see id.* at 44-45. Based only on one potential vague reference, the Court cannot find that Pasley exhausted his ADA claims. Pasley's reference to PTSD in the email, even if considered, does not provide factual allegations relating to his disability. Given that the EEOC charge says nothing about a disability, a request for

accommodation, or MBUSI's failure to provide an accommodation, there are clear "material differences," *Wu*, 863 F.2d at 1547, between Pasley's EEOC charge and his claims in Counts III and VI, *see* Doc. 23.

Pasley further argues that "there is no doubt that a reasonable investigator would be aware of the ADA claims because the scope of the investigation actually included Pasley's disability claims." Doc. 32 at 21. In support, Pasley cites only to the EEOC intake investigator's notes, claiming the EEOC did in fact investigate his disability claims. *Id.* at 21-22. But the intake interview does not support a finding of exhaustion. "[T]he employee's formal charge, not the intake questionnaire, is what counts." *Mukhina*, 162 F.4th at 1135.[11] Like an intake questionnaire, an intake interview is typically completed before the formal charge and does not serve the same purpose as the formal charge; the intake interview does not "inititat[e] [] the agency's investigation of the complaint"; the formal charge does. *See Pijnenburg*, 255 F.3d at 1306.[12]

---

[11] The intake interview and questionnaire are not the same as the formal charge. "The law is clear that a charge must be verified—*i.e.,* written under oath or affirmation—in order to support a valid judicial suit." *Francois v. Miami Dade Cnty., Port of Miami*, 432 F. App'x 819, 821 (11th Cir. 2011). Pasley's interview is not a verified complaint and is not evidence of the investigation.

[12] "The intake interview process is designed to ensure that an individual's submission meets the requirements of a charge of discrimination." *Lewis v. Mercedes-Benz USA, LLC*, No. 1:22-CV-4804, 2025 WL 2058826, at *3 (N.D. Ga. Feb. 6, 2025), *report and recommendation adopted*, No. 1:22-CV-04804, 2025 WL 2058824 (N.D. Ga. June 23, 2025). The intake interview is not part of the EEOC's investigation, which is triggered by the formal charge. Pasley offers no argument or evidence as to the intake interview playing a uniquely significant role in the EEOC's investigation of his claim.

Pasley's intake interview therefore functions neither as a formal charge nor as evidence of the investigation. The interview was on October 23, 2023, and Pasley finalized his charge on October 27, 2023. *See* Doc. 31-6; Doc. 26-2 at 44-45. There is also "no evidence that the EEOC considered the [interview] to be a charge of discrimination," *Bost v. Fed. Express Corp.*, 372 F.3d 1233 (11th Cir. 2004), and the law is clear that the actual charge directs the EEOC's investigation, so the interview taken to help Pasley file his charge is not evidence of what the EEOC actually investigated. *See Pijnenburg*, 255 F.3d at 1306.

Even if the Court considered the intake interview in its exhaustion analysis, "it would not help [Pasley]." *Mukhina*, 162 F.4th at 1135. The intake notes include the following: "CP states that he is a veteran with PTSD and depression, and he was trying to hold it in the role. … [H]e went on short term disability due to his disability …." Doc. 31-6 at 3. "CP states that he wrote a letter to Mr. Lackner, HR, and everyone up the management chain stating he was being retaliated against, harassment, and due to the advice of his physician for undue hardship and aggravated his disability." *Id.* at 4.

These notes are still insufficient to show that Pasley exhausted his disability claims. Considering the notes, the Court has, at most, statements that Pasley has PTSD and struggled with mental health during the relevant time period, which are not allegations that a failure to accommodate, disability discrimination, or retaliation

claim could "reasonably be expected to grow out of." *Gregory*, 355 F.3d at 1280. A mention of his alleged disability in an intake interview does not make it reasonable that an EEOC investigation, focused on allegations of race discrimination, would then include an investigation into MBUSI's motive as related to Pasley's PTSD.

Moreover, even if the EEOC did investigate Pasley's disability claims, that is irrelevant to the objective inquiry required here. The question is "the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," *Patterson*, 38 F.4th at 1345, not what investigation happened to follow from the charge. Otherwise, whether a plaintiff is deemed to have exhausted his claim could turn on whether his charge was assigned to a particularly dogged investigator or one giving only the minimum adequate effort. That risks "render[ing] arbitrary what the agency has attempted to make uniform." *Pijnenburg*, 255 F.3d at 1306-07; *but see Smith v. Sentry Ins.*, 674 F. Supp. 1459, 1467 (N.D. Ga. 1987) (concluding that "a judicial complaint of employment discrimination may include any allegations of discrimination encompassed by an EEOC investigation, even if the EEOC investigation was arguably broader than the EEOC charge triggering the investigation").

In sum, Pasley's ADA claims are not "inextricably intertwined" with his claims of racial discrimination and retaliation. *See Gregory*, 355 F.3d at 1280. The ADA claims pleaded in Count III and VI are entirely distinct from the allegations of

34

race discrimination brought in Pasley's EEOC charge. The Court thus finds that Pasley did not sufficiently exhaust his administrative remedies and cannot bring his ADA claims.

### B. Failure to Show a Covered "Disability"

Counts III and VI fail as a matter of law for another reason. To bring his ADA claims, Pasley must establish that he has a "disability" as defined by the Act. *See Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023). The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), and defines "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment," 42 U.S.C. § 12102(1); *see also Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). While Pasley's PTSD likely qualifies as an impairment, he still must show that it "substantially limits" his ability "to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

Pasley argues that he has presented "substantial evidence … that his PTSD substantially limits multiple major life activities." Doc. 32 at 23. Pasley's evidence consists of medical records, Doc. 26-13 at 95, 97, 110, 113, and his own testimony, *see generally* Docs. 26-1, 31-4. But a court "cannot assess whether [a plaintiff] meets the definition of disabled under the ADA" if "the record does not contain evidence

35

of the timing, frequency, and duration" of the alleged impairment. *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1273 (11th Cir. 2020); *see Lewis II*, 934 F.3d at 1181. Pasley's medical records show that he has Major Depressive Disorder which has periods of exacerbations, causing emotional dysregulation, short term memory loss, and sometimes insomnia, poor appetite, worsening depression, mood swings, and feeling overwhelmed with life. *See* Doc. 26-13 at 95, 97, 110, 113. Pasley testifies that his PTSD, when triggered, affects his ability to communicate well with others. Doc. 32 at 16, ¶23. But Pasley does not point to any evidence describing the frequency of these "periods of exacerbations" or explaining how often or for how long these symptoms affect his ability to work or participate in other major life activities.

Given the lack of specific evidence regarding the frequency and severity of Pasley's episodes and the resulting effect on his abilities, there is no genuine issue of material fact regarding whether he is "disabled." *Compare Munoz*, 981 F.3d at 1273 (holding that there was not enough evidence to determine whether impairment substantially limited plaintiff), *and Lewis II*, 934 F.3d at 1180-81 (same), *with Mazzeo*, 746 F.3d at 1268-70 (holding evidence to be sufficient when doctor testified and explained the injury and how it specifically affected plaintiff's ability to "walk, bend, sleep, and lift more than ten pounds"). With no evidence as to the timing, frequency, and duration of Pasley's depressive episodes and the resulting effect on

his ability to work or perform other major life activities, a jury would be unable to find that Pasley's PTSD substantially limits a major life event as compared to the general population. *See Munoz*, 981 F.3d at 1268-70.

## CONCLUSION

There is no genuine issue of material fact as to any of Pasley's claims. Accordingly, MBUSI's Motion for Summary Judgment (Doc. 25) is **GRANTED**. The Court **DENIES AS MOOT** MBUSI's Motion to Strike (Doc. 36). The Court will enter judgment by a separate order.

**DONE** and **ORDERED** this 10th day of April, 2026.

_____
**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

.

37